United States District Court
Southern District of Texas

**ENTERED**

November 22, 2022

Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ELMEN HOLDINGS, LLC, | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION No.: 4:19cv3293 |
| | § | |
| MARTIN MARIETTA MATERIALS INC., | § | |
| SUCCESSOR BY MERGER TO TEXAS | § | |
| INDUSTRIES, INC., | § | |
| *Defendant*. | § | |

**AMENDED MEMORANDUM AND RECOMMENDATION**

This dispute is before the Court on the parties' Renewed Cross-Motions for Summary Judgment. ECF 87, 88.[1] Having considered the parties' submissions and the law, the Court RECOMMENDS that Plaintiff Elmen Holdings, LLC's Motion be GRANTED and Defendant Martin Marietta Materials, Inc.'s Motion be DENIED.[2]

**I.     Factual and Procedural Background**

On April 16, 1970, Milton and Wilma Jean Minarcik (the Minarciks) executed a Sand and Gravel Mining Agreement (Gravel Lease or Lease) with Texas Industries, Inc. (TXI) granting TXI the exclusive right to mine sand and gravel on the Minarcik's property in Colorado County, Texas. ECF 1 at 18-39. It is undisputed that from the inception of the Lease to the present, no mining operations ever commenced on the property. ECF 60

---

[1] The District Judge referred this case to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. ECF 14.

[2] Martin Marietta's Objections and Motion to Strike, contained in its Response to Elmen's Motion for Summary Judgment (ECF 89), are denied as moot in light of the legal rulings herein.

at 7, ¶ 38; ECF 61 at 6 ¶ 38.  Martin Marietta acquired the Gravel Lease in 2014.  ECF 87-
1 at 35.  Elmen purchased the property from heirs of the Minarciks in 2018 and sued Martin
Marietta in Texas state court in Colorado County, seeking a declaratory judgment that the
Gravel Lease had terminated.  ECF 1 at 7-10.  Martin Marietta timely removed the case on
the basis of diversity jurisdiction.

Elmen previously filed, and the Court denied, a Motion for Judgment under Rule
12(c).  Elmen's Rule 12(c) motion argued that because the Gravel Lease does not contain
a definite term and lacks mutuality it creates a tenancy at will subject to termination at any
time by either party.  ECF 64.  Martin Marietta opposed the Rule 12(c) motion, arguing
that rather than creating a right to occupy the property for an indefinite term, the Gravel
Lease, like an oil and gas lease, creates a fee simple determinable interest in the minerals.
See ECF 67.  The Court construed the Gravel Lease to create a fee simple determinable
interest that was not subject to termination at will.  ECF 81 at 10 ("Texas law and the plain
language of the Gravel Lease mandate the conclusion that the Gravel Lease conveys a fee
simple determinable interest in the sand and gravel on the property.").  Thus, the Court
denied Elmen's Rule 12(c) motion.  ECF 83 (adopting ECF 81).

The parties also previously filed cross motions for summary judgment addressing
whether the lease has terminated or is subject to termination due to a failure to timely pay
advance royalties.  ECF 65; ECF 66.  Elmen's Motion argued it was entitled to a declaration
on summary judgment that the Lease has terminated because (1) Martin Marietta failed to
commence any gravel mining operations for over fifty years in violation of the implied
duty to reasonably develop a mineral lease; and (2) the Lease terminated because Martin

Marietta failed to timely pay the advance royalties required to extend the term of the Lease. ECF 66.   Conversely, Martin Marietta's motion for summary judgment argued that (1) because the Gravel Lease expressly disclaimed a duty to develop or commence mining operations the Lessee had no duty to develop the mineral lease; and (2) the Lease has not expired because, once Elmen, as Lessor, provided sufficient notice of the failure to pay advance royalties, Martin Marietta, as Lessee, paid within the cure period.  ECF 65.  The Court granted in part and denied in part the cross-motions for summary judgment.  ECF 86 (adopting ECF 84).  Specifically, the Court granted Martin Marietta's motion for summary judgment on Elmen's claim for breach of the implied duty to reasonably develop and denied Elmen's Motion on the same claim.  ECF 84 at 7.   As to Elmen's claim that the Gravel Lease terminated for failure to timely pay or tender advance royalties, the Court denied both parties' motions without prejudice to refiling on that issue.  *Id.*

The parties' previous cross motions for summary judgment focused heavily on whether and when Elmen or its predecessors in interest provided sufficient "notice" to Martin Marietta of its failure to pay advance royalties, and whether Martin Marietta timely "cured" the deficiency once sufficient notice was received.   *See* ECF 65; ECF 66. Unconvinced that the issue of "notice and cure" controlled whether the Lease had terminated, the Court instructed the parties "to brief whether the terms of the Lease operate as a special limitation (the failure of which causes automatic termination) or a condition subsequent (the failure of which provides a right of forfeiture after the notice and opportunity to cure)."  ECF 84 at 7.  The parties' renewed cross motions for summary

judgment, filed on July 13, 2022, are fully briefed and ripe for resolution.  *See* ECF 87, 88,

89, 90, 93, 94.

## II.     Governing Legal Principles

### A.  Qualifications on fee simple determinable interests in minerals.

The difference between a fee simple determinable interest in minerals and a

leasehold estate in real property has been explained by the Texas Supreme Court in the

context of oil and gas leases:

> In Texas it has long been recognized that an oil and gas lease is not a 'lease'
> in the traditional sense of a lease of the surface of real property.  In a typical
> oil or gas lease, the lessor is a grantor and grants a fee simple determinable
> interest to the lessee, who is actually a grantee. Consequently, the
> lessee/grantee acquires ownership of all the minerals in place that the
> lessor/grantor owned and purported to lease, subject to the possibility of
> reverter in the lessor/grantor. The lessee's/grantee's interest is 'determinable'
> because it may terminate and revert entirely to the lessor/grantor upon the
> occurrence of events that the lease specifies will cause termination of the
> estate.

*Natural Gas Pipeline Co. of Am. v.  Pool*, 124 S.W.3d 188, 192 (Tex. 2003) (internal

citations omitted).[3]

There are three primary qualifications imposed on the mineral interest conveyed by

a mineral lease: (1) limitations (often called special or conditional limitations); (2)

conditions subsequent; and (3) covenants.  *Blackmon v. XTO Energy*, 276 S.W.3d 600, 605

(Tex. App.—Waco, 2008 no pet.) (citing A.W. Walker, Jr., *The Nature of the Property

Interests Created by an Oil and Gas Lease in Texas*, 8 TEXAS L.REV. 483-84 (1930)).  "A

---

[3] The Court applies Texas substantive law in this case in which jurisdiction is based on diversity.  *Holt v. State Farm Fire & Cas. Co.*, 627 F.3d 188, 191 (5th Cir. 2010) (citing *Erie R. v. Tompkins*, 304 U.S. 64 (1938)).

special limitation in an oil and gas lease provides that the lease will automatically terminate upon the happening of a stipulated event." *Endeavor Energy Resources, L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 606 (Tex. 2018).  Because the event in a special limitation terminates the fee simple determinable interest automatically, no affirmative action is necessary to cause the mineral interest to revert to the lessor.  *Blackmon*, 276 S.W.3d at 605 (citing *W.T. Waggoner Estate v. Sigler Oil Co*., 19 S.W.2d 27, 31 (Tex. 1929)); *Field v. Shaw,* 535 S.W.2d 3, 5 (Tex. App.—Amarillo 1976, no writ).

In contrast, "a condition subsequent designates an event which, when it happens, gives the grantor the right to terminate the estate by reentry." *Field,* 535 S.W.2d at 5.  "The breach of a condition does not, of itself, divest the estate of the lessee," so the lessor must take some express action to terminate the lessee's estate and reacquire the fee simple determinable interest.  *Blackmon*, 276 S.W.3d at 605 (citing *W.T. Waggoner Estate*, 19 S.W.2d at 31).  Thus, the main distinction between the effect of lease language that creates a special limitation as opposed to a condition subsequent is that the occurrence of an event in a limitation results in automatic termination of the lessee's fee simple determinable interest (and reversion of the interest to the lessor), whereas the occurrence of an event in a condition subsequent creates only a right of termination and requires some action by the lessor to effect a termination of the lessee's interest and its reversion to the lessor.

Finally, a "covenant is an agreement duly made between the parties to do or not to do a particular act." *Blackmon*, 276 S.W.3d at 605 (citations omitted).  The breach of a covenant does not give the lessor any right of re-entry, but only the right to sue for damages. *Id*.; *Anadarko Petroleum Corp v. Thompson*, 94 S.W.3d 550, 560 (Tex. 2003) (except in

5

extraordinary circumstances, a covenant only subjects the breaching party to monetary damages).

Whether a lease provision constitutes a special limitation that automatically terminates the leasehold estate is a question of law to be determined by interpreting the express provisions of the lease.  *See Freeman v. Magnolia Petroleum Co*., 171 S.W. 2d 339, 342 (Tex. 1943) (stating that whether the term of a lease is a covenant or condition subsequent is a question of law).  "Although whether a lease has terminated is always a question of resolving the intention of the parties from the entire instrument, [the court] will not find a special limitation 'unless the language is so clear, precise, and unequivocal that [the court] can reasonably give it no other meaning.'" *Endeavor Energy Resources, L.P. v. Energen Resources Corp*., 615 S.W. 3d 144, 148 (Tex. 2020) (quoting *Anadarko Petroleum Corp.*, 94 S.W.3d at 554).

## B.    Standards of contract interpretation and construction

The general principles that govern the interpretation and construction[4] of contracts apply to mineral leases.  *Sundown Energy LP v. HJSA No. 3, Ltd. P'ship*, 622 S.W.3d 884, 888 (Tex. 2021).  When interpreting a mineral lease, the court's primary concern is to "ascertain the parties' intent as expressed within the lease's four corners." *Anadarko Petroleum Corp.*, 94 S.W.3d at 554.  The analysis starts with the language of the contract

---

[4] Interpreting a contract involves "applying the appropriate standards to words the parties have used in their agreement in order to determine the meaning of the words."  11 Williston on Contracts § 30:1 (4th ed). Construction of a contract involves "the court determining as a matter of law, not the sense of the words . . . but the legal meaning of the entire contract."  *Id*.  In other words, contract interpretation "involves ascertaining the meaning of the contractual words while construction involves deciding their legal effect." *Id*.  The terms are often used synonymously, but construction is "rightly used whenever the import of the writing is made to depend on a special sense imposed by law."  *Id.*

because it is the "best representation of what the parties mutually intended." *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015).  The court must "give the lease's language its plain, grammatical meaning unless doing so would clearly defeat the parties' intentions." *Anadarko Petroleum Corp.*, 94 S.W.3d at 554 (citing *Fox v. Thoreson*, 398 S.W.2d 88, 92 (Tex. 1966)).   To determine the parties' intent, the court must "examine the entire lease and attempt to harmonize all its parts, even if different parts appear contradictory or inconsistent[,]" because courts presume "the parties to a lease intend every clause to have some effect." *Id.*  "The most important consideration in interpreting a lease is the agreement's plain, grammatical language*." Endeavor Energy Resources, L.P.*, 615 S.W.3d at 148 (citing *Anadarko*, 94 S.W. 3d at 554).

Whether a lease is ambiguous is also a question of law for the court." *TRO-X, L.P. v. Anadarko Petroleum Corp.,* 548 S.W.3d 458, 462 (Tex. 2018). A contract is unambiguous if it creates a definite or certain legal meaning. *Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 743 (Tex. 2020).  The fact that the parties interpret an agreement differently does not make it ambiguous. *Id.*

## C.    Summary Judgment standards

Summary judgment is appropriate if no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a).  The party moving for summary judgment bears the initial burden to prove there are no genuine issues of material fact for trial. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001).  "Cross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to

judgment as a matter of law.  If there is no genuine issue and one of the parties is entitled

to   prevail as a matter of law,   the   court   may   render   summary   judgment."   *Shaw*

*Constructors v. ICF Kaiser Engineers, Inc.,* 395 F.3d 533, 538–39 (5th Cir. 2004) (internal

citations omitted).  If the moving party meets its initial burden, the nonmoving party must

go beyond the pleadings and must present evidence such as affidavits, depositions, answers

to interrogatories, and admissions on file to show "specific facts showing that there is a

genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

The court construes the evidence in the light most favorable to the nonmoving party

and draws all reasonable inferences in that party's favor.  *R.L. Inv. Prop., LLC v. Hamm*,

715 F.3d 145, 149 (5th Cir. 2013).  In ruling on a motion for summary judgment the Court

does not "weigh evidence, assess credibility, or determine the most reasonable inference

to be drawn from the evidence."  *Honore v. Douglas,* 833 F.2d 565, 567 (5th Cir. 1987).

However, "[c]onclus[ory] allegations and denials, speculation, improbable inferences,

unsubstantiated assertions, and legalistic argumentation do not adequately substitute for

specific facts showing a genuine issue for trial." *U.S. ex rel. Farmer v. City of Houston*,

523 F.3d 333, 337 (5th Cir. 2008) (citation omitted).

## III.    Relevant Gravel Lease provisions.

The  Gravel  Lease  contains  the  following  relevant  provisions  that  the  Court

interprets and construes in conjunction with the Lease as a whole when ruling on the

parties' cross motions for summary judgment:

> 2.    Subject to the other provisions herein contained the *term of this lease*
> *shall be for as long as merchantable materials are mined or produced* from

8

the leased premises, *or for as long as Lessee shall pay the advance minimum royalty* as hereinbelow specified.

3.      *As consideration for this Agreement, Lessee has, on the date hereof, deposited the sum of Three Thousand Dollars ($3,000) in Escrow* . . . .  The Escrow Agent shall hold said Escrow for a period of six (6) months following the date of this Agreement, and then release and pay said sum to Lessor, unless, on or before the end of said six (6) month period, Lessee shall terminate this Agreement by notifying Lessor and the Escrow Agent as provided in Section 5 hereinbelow. . . . .

4.      Lessee hereby agrees, on or before two (2) years from the date of this Agreement, to drill or dig any and all test holes . . . to determine the location, amount, and quality of commercially productive materials, . . .. Lessor hereby acknowledges and agrees that *the $3,000 Escrow Sum* delivered by Lessee . . . *constitutes sufficient consideration to continue this agreement in force for the duration of said two (2) year testing period and until the first payment of advance royalties is made hereunder by Lessee.*

5.      Lessee shall have the option to terminate this Agreement by furnishing written notice of termination to the Lessor . . . at any time prior to the expiration of six (6) months following the date hereof and recover back the Escrow Sum in the amount of $3,0000 which Lessee has deposited with the Escrow Agent. Should Lessee elect to terminate this Agreement by furnishing such notice, . . . then this Agreement shall terminate upon the date of such notice, and be of no further force and effect thereafter . . .. *Should Lessee elect not to furnish said notice* within such six (6) month period, then the *Escrow Agent shall pay said Escrow Sum to Lessor as consideration for maintaining this Agreement in force from the date hereof until payment of the first advance royalties hereunder by Lessee, and this Agreement shall continue in force for the term specified in Section 2 hereinabove.* ….

6.      *Commencing on April 16, 1972*, and on or before said day and month of each successive year hereunder, *Lessee shall pay or tender to Lessor, annual advance royalties as follows:*

     (a)      *$2,500.00 per year for the years 1972 and 1973*, then,

     (b)      *$4,000.00 per year for each year thereafter* up to and *including the year during which mining or production operations are commenced* on any portion of said land; then,

     (c)      *$3,000.00 per year* for each year *following the year in which mining or production operations are begun* on any portion of said land, *until this Agreement is terminated.*

It is understood and agreed by the parties hereto that any and all advance royalties paid by Lessee to Lessor hereunder shall constitute payment in advance of royalties, at the rate specified in Section 7 hereinbelow, for materials which may be mined and removed during any subsequent year or years hereunder. *Notwithstanding anything contained in this Lease to the contrary, should Lessee fail to pay or tender any amount of advance royalties when due, then Lessor shall notify Lessee in writing of such failure and this Lease shall not terminate unless and until Lessee shall have failed to pay or tender the amount of advance royalties due within ten (10) days following Lessee's receipt of such notice from Lessor.*

\*      \*      \*

8.      The Lessee shall, not later than the 20th day of the month following each month during which materials are removed and sold, make report to Lessor of the number of tons of merchantable materials removed . . ..Upon receipt of the report, it shall be the duty of the Lessor to inspect it for errors, and in the event either party shall discover errors in such report, it shall notify the other party in writing of such alleged errors.  Unless such errors shall have been called to the attention of the other party within thirty (30) days of the delivery of such report, the same shall be final as to the amount of materials removed. . . .*In the event Lessee shall fail or refuse within the time above specified either to pay or tender the amount of said royalty due for any month, or shall fail to make report* to Lessor showing the amount of said materials removed and sold from the leased premises, *then Lessor may, at his option, notify Lessee by registered mail of such failure . . . and if Lessee shall not make said payment or furnish said report to Lessor within thirty (30) days after receiving said registered mail notice, this contract shall be at an end and of no further force or effect. . . . .*

\*      \*      \*

11.      Lessor hereby warrants and agrees to defend the title to the lease premises and all of said materials against whomsoever claiming or to claim the same. . . .  If Lessee is prevented from conducting any of its operations under this lease by operation of force majeure or by acts of any public authority, or if Lessor or any third party, at any time, disputes . . . Lessee's right to mine and remove materials from the leased premises, or if any third party disputes Lessor's title to the leased premises or its rights to receive payments provided herein, and Lessee's operations hereunder are prevented or substantially hindered by such dispute, force majeure, or public acts, then *Lessee may, at its option, suspend all operations and payments hereunder*

10

until the dispute is terminated or any such cause is removed, *and the term of this Lease shall be extended for such period of time* without the necessity of any notice or payment of any consideration by Lessee.

\*      \*      \*

17.     Notwithstanding any other provision of this Agreement, if Lessee *shall fail to perform any obligation* contained in this Agreement or shall fail to comply with any term or provision of this Agreement, *Lessee shall not be in default of any such terms or provision and this Agreement shall not terminate unless and until Lessee shall not have cured any such failure within thirty (30) days after receiving notification of such failure from Lessor by registered mail.*

ECF 1 at 18-39 (all emphasis added).

## IV.  The Parties' Renewed Cross-Motions for Summary Judgment

### A.  The parties' contentions

Martin Marietta argues in its renewed Motion for Summary Judgment that the Court should reject Elmen's "final attack" on the Gravel Lease because the "enforceable notice and cure provision" in Paragraph 6 prevented the lease from automatically terminating when Martin Marrietta failed to pay annual royalty payments by April 16 of each year. ECF 87 at 11.  Martin Marietta first argues that the lease language in Paragraph 2 must be interpreted as a condition subsequent rather than a special limitation because the notice and cure provision in Paragraph 6 requires the lessor to take an affirmative act to terminate the lease.  ECF 87 at 13.  Martin Marietta also argues the Court need not decide whether the term of the Gravel Lease is a limitation or a condition subsequent because "the termination procedure operates the same way."  *Id.* at 15.  According to Martin Marietta:

[t]erminating the lease requires three steps: (1) Martin Marietta must miss a payment; (2) Elmen must send a proper notice of nonpayment; and (3) Martin Marietta must fail to pay within the cure period. . . . That is the

11

only interpretation that gives effect to every provision of the lease, as required by Texas law.

*Id.*

Elmen, on the other hand, argues Paragraph 2 of the Gravel Lease imposes a special limitation on the fee simple determinable interest, pointing out that the phrase "so long as" creates a special limitation that automatically terminates upon the happening of the stated event.  ECF 88 at 10-11 (*citing, e.g., McBride v. Farmer's & Merchants' Gin Co.*, 152 S.W. 1135, 1136 (Tex. Civ. App.—Dallas 1913, no writ); *W.T. Waggoner Estate v. Sigler Oil Co.*, 19 S.W.2d 27, 28-29 (Tex. 1929)).  Elmen correctly argues that a "fee simple determinable" interest "will automatically terminate if the event upon which it is limited occurs."  *Id.* (citing *Endeavor Energy Res, L.P.*, 554 S.W. 3d at 597 and *Anadarko Petroleum Corp.*, 94 S.W. 3d at 555).  However, Elmen concedes that courts must construe the four corners of the lease to determine whether a notice and cure provision is specifically intended to alter a special limitation.  ECF 88 at 12.  Elmen does not dispute Martin Marietta's contention that the notice and cure provision contained in Paragraph 6 applies to prevent automatic termination even if Paragraph 2 imposes a special limitation.

Each party assumes that regardless of whether the Lease language is interpreted to impose a special limitation, the Lease will not terminate absent notice and a ten-day cure period as set forth in Paragraph 6.  As a result, both parties' renewed motions for summary judgment continue to focus on whether Elmen provided sufficient notice of non-payment of the advance royalties and whether, after receipt of sufficient notice, Martin Marietta made the advance minimum royalty payment required to continue the Lease term within

the ten-day cure period.  *See* ECF 87, 88.

### B.  Interpretation and construction of the Gravel Lease.

Recent decisions by the Texas Supreme Court instruct that whether a provision in a lease causes automatic termination rather than a right to terminate must be determined by "conducting a careful and detailed examination of a deed in its entirety[.]"  *Pirhana Partners*, 596 S.W.3d at 746.  To determine whether the Gravel Lease imposes a special limitation on the Lessee's mineral estate, the Court must apply the well settled rules of contract interpretation and construction on which the Texas Supreme Court continues to rely.  Those well settled rules include:  the rule that courts construe language according to its "plain, ordinary and generally accepted meaning"; the rule that courts "construe words in the context in which they are used"; the rule that courts "avoid any construction that renders a provisions meaningless"; and the rule that courts consider and construe all of a contract's provisions together "so that the effect or meaning of one part on any other part may be determined."  *Pirhana Partners*, 596 S.W.3d at 747 (citations omitted).  The Court applies all these rules to interpret the parties' intent as expressed in the Gravel Lease and to construe the legal effect of that intent.

### 1.    Paragraph 2 defines the duration of the Lease.

To begin its interpretation of the Gravel Lease, the Court looks to the definition of the Lease term set forth in Paragraph 2:

> 2.     Subject to the other provisions herein contained *the term* of this lease *shall be for as long as merchantable materials are mined or produced* from the leased premises, *or for as long as Lessee shall pay the advance minimum royalty as hereinbelow specified.*

ECF 1 at 19 (emphasis added).  The plain grammatical meaning of the word "term" as used in Paragraph 2 is "a limited or definite extent of time" or "the whole period for which an estate is granted."  Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/term (last visited Nov. 19, 2022).  Thus, according to the plain meaning of the language used, Paragraph 2 functions as a habendum clause which "defines the mineral estate's duration." *Anadarko Petroleum Corp.*, 94 S.W.3d at 554.  Texas courts interpret habendum clauses that continue a lease "for so long as" minerals are produced or royalties are paid, to create a special limitation on the grant of the mineral estate.  *See*, *e.g*., *Clark v. Perez*, 679 S.W.2d 710, 712 (Tex. App.—San Antonio 1984, no writ) (stating it is well settled law that a lease for primary term and as long thereafter as oil or gas is produced "constitutes a special limitation on the estate transferred"); *Lynch v. Southern Coast Drilling Co.*, 442 S.W.2d 804, 806 (Tex. Civ. App.—San Antonio 1969, no writ) (stating it is well settled in Texas that a "for so long as oil and gas is produced" provision constitutes a special limitation).  In turn, when the grant of a mineral estate is subject to a special limitation, the estate automatically terminates upon the occurrence of the limitation.  *See Endeavor Energy Resources, L.P.*, 554 S.W.3d at 606 (stating a lease term "for as long as oil and gas is produced" may continue indefinitely but will terminate automatically if production ceases); *Anadarko Petroleum Corp.*, 94 S.W.3d at 554 (stating that "a mineral estate will automatically terminate if the event upon which it is limited occurs" and a "lease that lasts 'as long as oil or gas is produced' automatically terminates" if production permanently ceases); *Stephenson v. Calliham*, 289 S.W. 158, 159 (Tex. App.—San Antonio 1926, no writ) (holding that lease with a term that lasted during drilling and as

long as oil or gas is produced "ipso facto terminated" the moment drilling operations ceased and could not be revived by any act of the lessee); *see also EnerQuest Oil & Gas, LLC v. Plains Expl. & Prod. Co.*, 981 F. Supp. 2d 575, 585 (W.D. Tex. 2013) (citing Texas law and holding that a lease for primary term and "for as long thereafter as a covered mineral is produced" terminated automatically when shut in royalties were not paid on specified date).

Read independently of any other provision, Paragraph 2 provides that, absent both the mining or production of merchantable materials, and payment of advance royalties as specified, the Lessee's interest in the mineral estate automatically terminates and reverts to the Lessor. *See Anadarko Petroleum Corp.*, 94 S.W.3d at 554 (stating that "a mineral estate will automatically terminate if the event upon which it is limited occurs"). However, the Texas Supreme Court has made clear that it no longer follows an arbitrary rule of contract construction under which habendum clauses or granting clauses like Paragraph 2 take absolute priority over other clauses in a lease:

> [Although] [w]e have not yet endeavored to clearly distinguish between the 'arbitrary,' 'mechanical,' and 'default' rules we have 'cast off' and the 'well-settled contract construction principles' on which we continue to rely….. the former category has included . . . a rule giving certain clauses—like a 'granting' clause, . . . or 'habendum' clause—absolute priority over other clauses.

*Pirhana Partners*, 596 S.W.3d at 747 (citations omitted). Thus, the habendum clause in Paragraph 2 cannot be mechanically interpreted to take absolute priority over other clauses in the Lease and the Court must examine the entire Lease to determine the parties' intent as expressed in the written document. Specifically, the Court must examine the entire

Lease to determine whether, as Martin Marietta argues, the "notice and cure" language in Paragraph 6 demonstrates the parties' intent that the Lease will not terminate automatically if no merchantable materials are being mined or produced *and* advance minimum royalties are not paid as specified.

        **2.**        **Paragraph 6 specifies various advance annual royalty payments.**

Paragraph 6 specifies the various advance royalties and the dates by which they must be paid:

> 6.    *Commencing on April 16, 1972, and on or before said day and month of each successive year* hereunder, Lessee shall pay or tender to Lessor, annual advance royalties as follows:
>
> (a)    $2,500.00 per year *for the years 1972 and 1973*; then,
> (b)    $4,000.00 per year *for each year thereafter up to and including the year during which mining or production operations are commenced* on any portion of said land; then,
> (c)    $3,000.00 per year *for each year following the year in which mining or production operations are begun* on any portion of said land, *until this Agreement is terminated*.

ECF 1 at 20 (emphasis added). First, the advance royalty payments specified in Paragraph 6(a) fall due on April 16, 1972 and 1973 in the amount of $2,500. However, the Lease term began on April 16, 1970. The first two years of the lease, from April 16, 1970 through April 16, 1972 were a testing period during which test holes could be drilled to determine the location and quality of commercial mineral deposits. ECF 1 at 19 ¶ 4. Pursuant to Paragraph 2, the Lease would have terminated if no mining or production commenced during the initial two-year testing period because no advance royalty payment is specified during the initial two years. To avoid automatic termination of the Lease before the commencement of mining operations or the payment of specified advance royalties, the

parties included language in Paragraph 4 to maintain the term of the Lease term from April

16, 1970 through the date of the first advance royalty payment on April 16, 1972:

> 4.      Lessee hereby agrees, on or before two (2) years from the date
> of this Agreement, to drill or dig any and all test holes . . . to determine the
> location, amount, and quality of commercially productive materials, . . ..
> Lessor hereby acknowledges and agrees that *the $3,000 Escrow Sum
> delivered by Lessee . . . constitutes sufficient consideration to continue this
> agreement in force for the duration of said two (2) year testing period and
> until the first payment of advance royalties is made hereunder by Lessee.*

*Id.* at 19 (emphasis added).

Next, for the period beginning after April 16, 1973 and ending on April 16 of the

year in which mining or production operations are commenced, the term of the Lease could

be maintained *only* by the payment of the $4,000 advance minimum royalty on or before

April 16 of each year as specified in 6(b):

> 6.      Commencing on April 16, 1972, and on or before said day and
> month of each successive year hereunder, Lessee shall pay or tender to
> Lessor, annual advance royalties as follows:
>
> (a)      $2,500.00 per year for the years 1972 and 1973, then,
> (b)      *$4,000.00 per year for each year thereafter up to and
>          including the year during which mining or production
>          operations are commenced* on any portion of said land; . . .

*Id.* at 20 (emphasis added).  The plain meaning of the language in Paragraphs 2 and 6,

demonstrates the parties' intent that, after the advance royalty payment in 1973 and prior

to the commencement of mining or production operations, the term of the lease could be

maintained by the payment of the $4,000 advance royalty on or before April 16 of every

successive year.

Finally, once mining or production operations are commenced, a $3,000 advance royalty must be paid on or before April 16 of each successive year:

> (c)    $3,000.00 per year *for each year following the year in which mining or production operations are begun* on any portion of said land, *until this Agreement is terminated.*

*Id.* (emphasis added).  The advance royalty payments specified in 6(c) must be paid regardless of whether merchantable materials are being mined or produced.  Consequently, when the Lease term remains in effect because merchantable materials are being mined or produced, the payment of advance royalties specified in Paragraph 6(c) no longer operates as a special limitation on the mineral estate, and the failure to pay those advance royalties on or before April 16 of each successive year, will not automatically terminate the Lease.

### 3.    Paragraph 6 also contains a "notice and cure" provision.

According to Martin Marietta, the Lease cannot terminate by operation of the habendum clause in Paragraph 2 unless and until the Lessor notifies the Lessee of its failure to make an advance royalty payment by April 16 and provides the Lessee with ten days in which to cure the failure.  ECF 87 at 15.  Martin Marietta bases this argument on the italicized language below which follows the specified advance minimum royalties in Paragraph 6:

> It is understood and agreed by the parties hereto that any and all advance royalties paid by Lessee to Lessor hereunder shall constitute payment in advance of royalties, at the rate specified in Section 7 hereinbelow, for materials which may be mined and removed during any subsequent year or years hereunder.  *Notwithstanding anything contained in this Lease to the contrary, should Lessee fail to pay or tender any amount of advance royalties when due, then Lessor shall notify Lessee in writing of such failure and this Lease shall not terminate unless and until Lessee shall have*

> *failed to pay or tender the amount of advance royalties due within ten (10) days following Lessee's receipt of such notice from Lessor.*

ECF 1 at 19 (emphasis added).  This "notice and cure" language in Paragraph 6 clearly applies when Lessee fails to make a timely advance royalty payment under Paragraph 6(c). However, in the absence of both (1) mining or production and (2) timely advance royalty payments pursuant to Paragraph 6(b), the Lease terminates automatically pursuant to Paragraph 2.  As previously discussed, lease language similar to that in Paragraph 2 has been interpreted time and again by Texas courts to cause *automatic* termination upon the occurrence or non-occurrence specified in the clause.  *See supra* at 14-15.  Absent specific language to the contrary, a "mineral estate will automatically terminate if the event upon which it is limited occurs."  *Anadarko Petroleum Corp*., 94 S.W.3d at 554; *see also, Kincaid v. Gulf Oil Corp*., 675 S.W.2d 250, 256 (Tex. Civ. App.—San Antonio, 1984 writ ref'd n.r.e.) (interpreting language that lease would not terminate until after notice and a cure period in the event lessee made a bona fide but ineffective and timely payment, as precluding automatic termination pursuant to a special limitation).

### 4.  The plain meaning of the Lease language demonstrates the Parties did not intend for the notice provision in Paragraph 6 to prevent automatic termination pursuant to Paragraph 2.

No language in the Gravel Lease, including the notice provision in Paragraph 6 on which Martin Marietta relies, extends the term of the Lease until such time as the Lessor notifies the Lessee of a missed advance royalty payment.  The parties clearly intended that the Lease term would last only "for as long as" merchantable materials were mined or produced, or the advance royalty payments were made as specified in 6(a)-(c).  The parties

did not intend for the notice provision in Paragraph 6 to prevent automatic termination of the Lease by its own terms because they did not include any language to extend or maintain the term of the lease until the Lessor notifies the Lessee of its failure to make the advance royalty payment.   This lack of intent is demonstrated by the fact that the parties knew how to and did include language in Paragraphs 4 and 5 extending the term of the lease during the testing period until the first advance royalty payments were due:

> 4.      . . . the $3,000 Escrow Sum. . . constitutes sufficient *consideration to continue this agreement in force for the duration of said two (2) year testing period* and until the first payment of advance royalties is made hereunder by Lessee";
>
> 5.     . . . Escrow Agent shall pay said Escrow Sum to Lessor as consideration for *maintaining this Agreement in force from the date hereof until payment of the first advance royalties hereunder by Lessee*, and this Agreement shall continue in force for the term specified in Section 2 hereinabove.

ECF 1 at 19 (emphasis added).   Furthermore, the parties knew how to and did include language clearly demonstrating their intent to maintain the term of the lease in the event of a force majeure event or a dispute which interfered with the Lessee's mining or production operations:

> 11.    . . . .   If Lessee is prevented from conducting any of its operations under this lease by operation of force majeure or by acts of any public authority, or if Lessor or any third party, at any time, disputes . . . Lessee's right to mine and remove materials from the leased premises, . . . and Lessee's operations hereunder are prevented or substantially hindered by such dispute, force majeure, or public acts, then *Lessee may, at its option, suspend all operations and payments hereunder* until the dispute is terminated or any such cause is removed, *and the term of this Lease shall be extended for such period of time* without the necessity of any notice or payment of any consideration by Lessee.

ECF 1 at 24 (emphasis added).

In addition, if the parties had intended to require notice of a missed royalty payment and an opportunity to cure before the Lease could terminate according to its terms, they knew how to draft language that would do just that.   Paragraph 8, which obligates the Lessee to provide monthly reports and pay monthly royalties for materials actually sold, grants Lessor the option to provide notice to Lessee of its failure to comply with the monthly obligation and provides for automatic termination if Lessee fails to cure within thirty days:

> 8.     The Lessee shall, not later than the 20th day of the month following each month during which materials are removed and sold, make report to Lessor of the number of tons of merchantable materials removed . . . .  *In the event Lessee shall fail or refuse within the time above specified either to pay or tender the amount of said royalty due for any month*, or shall fail to make report to Lessor showing the amount of said materials removed and sold from the leased premises, then *Lessor may, at his option, notify Lessee by registered mail of such failure . . . and if Lessee shall not make said payment or furnish said report to Lessor within thirty (30) days after receiving said registered mail notice, this contract shall be at an end and of no further force or effect.*  . . . .

ECF 1 at 23 (emphasis added).  The language in Paragraph 8 demonstrates the parties' intent that the Lease would terminate for failure to provide a monthly report or pay a monthly royalty, but only after notice from the Lessor and a failure to cure within 30 days. No such language in Paragraph 2 demonstrates that the Parties intended for the Gravel Lease to continue indefinitely until Lessor provided notice of a missed or late annual royalty payment when such payment was required to maintain the Lease term.

Examination of the entire Gravel Lease demonstrates that had the parties intended to extend the term of the Lease from the time of a missed annual advance royalty payment until such time that the Lessor provided notice to Lessee of the missed payment (and during

the ten-day cure period following that notice), they could have included language expressly extending the Lease term as they did in Paragraphs 4 and 11.   Likewise, if the parties had intended to require action by the Lessor in the form of notice and an opportunity to cure before Paragraph 2 could be given effect, they could have used language similar to that in Paragraph 8.  They did neither.  In sum, the notice provision in Paragraph 6 is inapplicable to prevent automatic termination pursuant to the special limitation in Paragraph 2.  *See Lynch*, 442 S.W.2d at 809 (holding that "where an event occurs which, under the language of the lease, limits the duration of the estate, a clause which purports to protect the lessee against loss of his rights unless the circumstances show an intent to abandon is inapplicable.").

### 5. No provision is rendered meaningless by the Court's interpretation.

Martin Marietta argues that the notice and cure provision must be interpreted to preclude automatic termination of the Lease under Paragraph 2 absent notice from the Lessor because that is the only interpretation that gives effect to all provisions in the Lease. ECF 87 at 15.  To the contrary, no part of Paragraph 6 is rendered meaningless by an interpretation that the notice provision does not revive, extend, or preclude automatic termination of the Lease term.  As discussed above, even if the Lease is maintained by the mining or production of merchantable materials, the Lessor is still obligated to pay the advance royalties specified in 6(c) on an annual basis.  Thus, the notice provision in Paragraph 6 applies when merchantable materials are being mined and produced, but the royalty payment in 6(c) is not made by April 16 of the applicable year.  Likewise, the

phrase "[n]otwithstanding anything contained in this Lease to the contrary" in Paragraph 6 distinguishes the 10-day cure period applicable to the failure to make an annual advance royalty payment in a year when the Lease is maintained by mining or production, from the 30-day cure periods set forth in Paragraphs 8 and 17.  ECF 1 at 24, 27.  Therefore, the notice and cure provision in Paragraph 6 is not rendered meaningless by an interpretation that it neither extends the Lease term nor prevents automatic termination of the Lease pursuant to Paragraph 2.

### 6. Interpreting the notice provision in Paragraph 6 to preclude automatic termination would render Paragraph 2 meaningless.

To interpret the notice provision in Paragraph 6 to preclude automatic termination of the lease term would render Paragraph 2 meaningless.  For example, if the notice provision in Paragraph 6 were interpreted to prevent automatic termination of the Lease pursuant to Paragraph 2, then in the absence of mining or production the lease term would continue—whether for one year, several years, or indefinitely—until Lessor notified Lessee it had missed the annual royalty payment required to maintain the Lease.  Such an interpretation would render the Lease term in Paragraph 2 meaningless because "[t]he effect of non-notification is to allow the lessee to hold the lease. . . without compensating the lessor[.]"  *See Ernest E. Smith and Jaqueline Lang Weaver*, TEXAS LAW OF OIL AND GAS (2d ed. 2021), § 4.3(B)(2).  It makes sense that the parties would include the notice and cure provision in Paragraph 6 to prevent automatic termination for a missed annual royalty payment when Lessee is otherwise maintaining the Lease through the mining or production of merchantable materials.  However, it would not make sense for the parties

to limit the duration of Lessee's fee simple determinable interest to the period "for as long as" merchantable materials are mined or produced or advance royalties paid and, at the same time, allow the Lessee to hold the fee simple determinable interest indefinitely without compensating the Lessor when, in the absence of mining or production, the Lessor fails to provide notice of a missed annual royalty payment.

### 7. Automatic termination pursuant to Paragraph 2 does not operate as a forfeiture.

Although Texas law cautions that contracts should be construed to avoid forfeitures, no forfeiture occurs when a lease terminates by its own provision or special limitation. *See Endeavor Energy Resources, L.P*., 554 S.W. 3d at 606 (construing a contract to impose a special limitation did not result in forfeiture); *Tier 1 Res. Partners v. Delaware Basin Res. LLC*, 633 S.W.3d 730, 738–39 (Tex. App.—El Paso 2021, pet. filed) (noting termination of the Lease was not a disfavored forfeiture, but simply termination pursuant to its own terms); *Woodson Oil Co. v. Pruett*, 281 S.W.2d 159, 164 (Tex. Civ. App. 1955) (stating "no principle of forfeiture [is] involved when a lease is terminated by its own provisions for cessation of production."). "A forfeiture cuts short the natural limit of a leasehold interest, and generally arises from the failure to comply with a condition subsequent." *Tier 1 Res. Partners,* 633 S.W.3d at 738–39 (citation omitted). "By contrast, a special limitation does not cut short the estate, but simply fixes one of the natural limits of the estate beyond which the estate cannot endure . . .." *Endeavor Energy Resources, L.P.*, 554 S.W. 3d at 606 n.14. Thus, interpretation of Paragraph 2 of the Gravel Lease as a special limitation

does not operate as a disfavored forfeiture of Martin Marietta's fee simple determinable interest in the mineral estate.

### 8. The Lease is unambiguous.

Finally, neither Elmen nor Martin Marietta contends the Gravel Lease is ambiguous. "[A] contract is ambiguous only when the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning." *RSUI Indemnity Co.*, 466 S.W.3d at 119.  After applying the pertinent rules of contract interpretation to the language of the Gravel Lease and giving the words used by the parties their plain and ordinary meaning, the Court finds the relevant Lease provisions to be unambiguous and subject to construction as a matter of law.  *See Piranha Partners*, 596 S.W.3d at 743 (stating that if a contract is unambiguous, the court "will determine its meaning as a matter of law"); *TRO-X, L.P. v. Anadarko Petroleum Corp.*, 548 S.W.3d 458, 462 (Tex. 2018) (whether a contract is ambiguous is a question of law, as is the proper construction of an unambiguous contract).

In sum, the Court finds that the unambiguous, clear, and precise language of the Lease is so unequivocal that it can reasonably be given no other meaning:  the Lease terminates automatically in the absence of mining or production of merchantable materials and payment by April 16 of each successive year of the appropriate amount of advance annual royalty.  *See Anadarko Petroleum Corp.*, 94 S.W.3d at 554 (stating a court "will not hold the lease's language to impose a special limitation on the grant unless the language is so clear, precise, and unequivocal that [the court] can reasonably give it no other meaning.").  The provision in Paragraph 6 stating that the lease shall not terminate absent

notice from the Lessor of a missed royalty payment applies only to payments under Paragraph 6(c) that are missed while the Lease is otherwise still in effect due to the mining or production of sand or gravel. To interpret the notice provision to preclude automatic termination in the absence of mining or production of merchantable materials *and* the timely payment of the appropriate advance royalty, would render Paragraph 2 meaningless.

**V.   The Gravel Lease terminated automatically pursuant to Paragraph 2.**

The parties agree that no operations for the mining or production of sand or gravel were ever commenced. ECF 60 at 7, ¶ 38; ECF 61 at 6, ¶ 38. Thus, the undisputed summary judgment record demonstrates that the term of the Lease was never maintained by the mining or production of merchantable materials. Absent the commencement of mining operations, the term of the Gravel Lease was maintained only by the payment of the annual royalty payment set forth in Paragraph 6(b):

> 6.      Commencing on April 16, 1972, and on or before said day and month of each successive year hereunder, Lessee shall pay or tender to Lessor, annual advance royalties as follows:
>
> (a)     $2,500.00 per year for the years 1972 and 1973, then,
> (b)     *$4,000.00 per year for each year thereafter up to and including the year during which mining or production operations are commenced* on any portion of said land. . . .

ECF 1 at 20. The undisputed summary judgment evidence presented by Martin Marietta establishes:

- A 2015 annual royalty check payable to Wilma Minarcik issued on July 6, 2016;

- A 2016 annual royalty check payable to Wilma Minarcik issued on May 11, 2016;

- A 2017 annual royalty check payable to Wilma Minarcik issued on April 12, 2017;

26

- A 2018 annual royalty check payable to Sam O'Callahan issued on October 19, 2018;

- A 2018 annual royalty check payable to Elmen issued on December 12, 2018;

- A 2019 annual royalty check payable to Elmen issued on August 5, 2019;

- A 2020 annual royalty check payable to Elmen issued on September 10, 2020; and

- A 2021 annual royalty check payable to Elmen issued on May 20, 2021.

ECF 65-4 at 45; ECF 87-4 at 45.

The undisputed evidence in the summary judgment record establishes that no mining operations ever commenced on the property and that Martin Marietta as Lessee did not make an annual royalty payment by April 16, 2015 or by April 16 in several subsequent years. The "notice and cure" provision in Paragraph 6 neither extends the term of the Lease nor prevents the automatic termination of the Lease pursuant to Paragraph 2. Therefore, the Gravel Lease and Martin Marietta's fee simple determinable interest in the mineral estate terminated automatically on April 17, 2015. Martin Marietta's subsequent payments and tenders did not revive the Lease term or its interest in the mineral estate. As the Texas Supreme Court explained in *Freeman v. Magnolia Petroleum Co.*, 171 S.W.2d 339, 342 (Tex. 1943):

> If [Lessee] had wanted to prevent lapsation of the lease for nonproduction they could easily have done so by paying the fifty dollars on or before the last day of the primary term. . . . The lease lapsed as a matter of law when they so failed, and it could not be revived by their attempt to perform the condition more than four months after the contract said it should be performed.

Martin Marietta could have prevented the "lapsation of the lease" by paying the $4,000 annual advance royalty on or before April 16, 2015. Martin Marietta did not do so.

27

Therefore, the Lease terminated and the fee simple determinable interest in minerals granted by the Lease reverted to the Lessor.

## VI.    Conclusion and Recommendation

For the reasons set forth above, the Court RECOMMENDS that Elmen's renewed Motion for Summary Judgment (ECF 88) be GRANTED, Martin Marietta's renewed Motion for Summary Judgment (ECF 87) be DENIED, and a Declaratory Judgment be issued declaring the Gravel Lease terminated.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c).  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc), superseded by statute on other grounds.

 Signed on November 22, 2022, at Houston, Texas.

Christina A. Bryan
United States Magistrate Judge